Not for Publication

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE FETZIMA** | Civil Action No. 17-10230-ES-MAH (CONSOLIDATED) |

**SALAS, DISTRICT JUDGE**

Before the Court is the parties' request for claim construction. The Court held a *Markman* hearing on September 27, 2019. (D.E. No. 204). This Opinion sets forth the Court's constructions of the disputed terms.

## I.  Background

This case involves plaintiffs Allergan Sales, LLC, Allergan USA, Inc., Allergan Pharmaceuticals International Limited,[1] and Pierre Fabre Medicament S.A.S.'s (collectively, "Plaintiffs") drug product, Fetzima®, which is used to treat patients with major depressive disorder. (D.E. No. 102 ("Pl. Open. Br.") at 1; D.E. No. 101 ("Def. Open. Br.") at 2). The active ingredient in Fetzima® is levomilnacipran hydrochloride, which is the dextrogyral enantiomer of milnacipran hydrochloride. (*See* Pl. Open. Br. at 3–4; Def. Open. Br. at 2–3). Plaintiffs initially asserted three patents against defendants Aurobindo Pharma USA, Inc. and Aurobindo Pharma

---

[1] On December 28, 2020, upon the party's request and in light of "a formal corporate restructuring and name change," Judge Hammer granted plaintiff Forest Laboratories Holdings Limited's request that it will be known as Forest Laboratories Holdings Unlimited Company in this matter. (D.E. No. 379). Subsequently, on February 19, 2021, Judge Hammer granted another name-changing request and ordered that plaintiff Forest Laboratories Holdings Unlimited Company shall be known as "Allergan Pharmaceuticals International Limited" in this matter. (D.E. No. 399).

Limited, MSN Laboratories Private Limited and MSN Pharmaceuticals, Inc., Torrent Pharmaceuticals Limited and Torrent Pharma Inc., and Zydus Pharmaceuticals (USA) Inc. (collectively, "Defendants"), alleging that their respective Abbreviated New Drug Applications ("ANDAs") constitute patent infringement. (D.E. No. 87 ("Joint Stmt.") at 2). At issue for claim construction are two of the three asserted patents: United States Patents No. 8,481,598 (the "'598 Patent") and No. RE43, 879 (the "'879 Patent"), both of which involve method of treatment claims regarding levomilnacipran and its derivatives.

## II. Legal Standard

A patent claim is that "portion of the patent document that defines the scope of the patentee's rights." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 321 (2015). When the parties in a patent infringement action "present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

The words of a claim are generally given their ordinary and customary meaning, which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). To determine the ordinary and customary meaning of a disputed term, the court must look to "those sources available to the public that show what a person of skill in the art would have understood [the] disputed claim language to mean." *Id.* at 1314. To this end, "the court has numerous sources that it may properly utilize for guidance. These sources . . . include both intrinsic evidence (*e.g.*, the patent specification and file history) and extrinsic evidence (*e.g.*, expert testimony)." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

With respect to intrinsic evidence, the court must "look to the claim language, the specification, the prosecution history, and any relevant extrinsic evidence." *Meyer Intellectual Props. Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1368 (Fed. Cir. 2012). "[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. Indeed, "the context in which a term is used in the asserted claim can be highly instructive." *Id.* Similarly, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term." *Id.*

The specification "is always highly relevant to the claim construction analysis" and "is the single best guide to the meaning of a disputed term." *Id.* at 1315. "[T]he specification may reveal a special definition given to a claim term by the patentee" or "may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id.* at 1316. Thus, "the specification necessarily informs the proper construction of the claims," and it is "entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims." *Id.* at 1316–17. Notably, however, the court may "not read limitations from the specification into claims." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012). In particular, the Federal Circuit has "repeatedly warned against confining the claims to . . . embodiments" described in the specification. *Phillips*, 415 F.3d at 1323.

Courts must also consider the patent's prosecution history, *i.e.*, "the complete record of the proceedings before the PTO . . . includ[ing] the prior art cited during the examination of the patent." *Id.* at 1317. Although the prosecution history "often lacks the clarity of the specification and thus is less useful for claim construction purposes," it can nevertheless "inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether

the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

In sum, "[c]laim terms are given their ordinary and customary meaning—the meaning that they would have to a person of ordinary skill in the art in light of the specification and prosecution history at the time of the invention." *Woods v. DeAngelo Marine Exhaust, Inc.*, 692 F.3d 1272, 1283 (Fed. Cir. 2012). And "[c]laim terms are properly construed to include limitations not otherwise inherent in the term only when a patentee sets out a definition and acts as his own lexicographer, or when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Id.* (internal quotation marks omitted); *see also Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) ("The written description and other parts of the specification, for example, may shed contextual light on the plain and ordinary meaning; however, they cannot be used to narrow a claim term to deviate from the plain and ordinary meaning unless the inventor acted as his own lexicographer or intentionally disclaimed or disavowed claim scope.").

Finally, the court may also rely on extrinsic evidence, *i.e.*, "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317. But extrinsic evidence "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1319.

## III. Analysis

The parties seek the Court's construction of two disputed terms, one from each patent. Because the parties are well aware of the facts, the technology, and the posture of this case, the Court will immediately turn to the parties' disputes and will address each disputed term in turn.

### A. "about 120 mg/day of levomilnacipran or a pharmaceutically acceptable salt thereof"

The '598 Patent claims methods for treating major depressive disorder by administering to the patient about 120 mg/day of levomilnacipran or a pharmaceutically acceptable salt. The disputed term appears in Claims 1 to 8 of the '598 Patent. A representative claim reads as follows:

> A method for treating major depressive disorder in a patient in need thereof, comprising administering to the patient <u>about 120 mg/day of levomilnacipran or a pharmaceutically acceptable salt thereof</u> in one or more sustained release oral dosage forms,
>
> > wherein the administering step provides a therapeutic blood plasma level of levomilnacipran or pharmaceutically acceptable salt thereof over approximately a twenty-four hour period to treat major depressive disorder in the patient, and
> >
> > wherein the administering step provides an average maximum plasma concentration ($C_{max}$) between about 50 ng/mL and about 350 ng/mL of levomilnacipran or pharmaceutically acceptable salt thereof, an $AUC_{0-\infty}$ between about 1000 ng·hr/mL and about 9000 ng·hr/mL and a $T_{max}$ of at least 3 hours to the patient."

'598 Patent, Claim 1 (emphasis added). The parties dispute the proper construction of the phrase "about 120 mg/day of levomilnacipran or a pharmaceutically acceptable salt thereof." (Joint Stmt. at 4). Defendants' proposed construction is: "about 120 mg/day of levomilnacipran or about 120 ml/day of a pharmaceutically acceptable salt of levomilnacipran." (*Id.*). Plaintiffs' updated proposed construction is: "[about] 120 mg/day of levomilnacipran or a molecular weight equivalent amount of a pharmaceutically acceptable salt of levomilnacipran." (*See* D.E. No. 114 ("Pl. Resp. Br.") at 7 (emphasis omitted))[2]. Thus, the parties dispute whether the dosage limitation,

---

[2] Plaintiffs' initial proposed construction was: "approximately 120 mg/day of levomilnacipran or an equivalent amount of a pharmaceutically acceptable salt of levomilnacipran." (*Id.*). Plaintiffs subsequently made several edits to their initial proposal, either to correct a typographic error or to respond to Defendants' arguments. As a result, the parties no longer dispute the word "about" in the claims. (*See id.* at 10–11; *see also* D.E. No. 211 ("Markman Hr'g Tr.") at 42:13–15 (counsel for Plaintiffs stating "if you want to keep 'about' we don't care. The specification says 'about' and 'approximately' meaning the exact same thing.")).

120 mg/day, modifies only the active moiety of the levomilnacipran salt, as Plaintiffs argue, or, instead, modifies the overall levomilnacipran salt compound, as Defendants argue.

According to Plaintiffs, "120 mg/day" refers to the "dosage amount or strength" in terms of the active moiety—levomilnacipran free base. (*See* Pl. Open. Br. at 14). Because salt forms of levomilnacipran generally have higher molecular weight than the free base form of levomilnacipran, maintaining the same "dosage amount or strength" of 120 mg/day of levomilnacipran free base would result in administering more than 120 mg of levomilnacipran salt per day. (*See id.* at 11). Under Plaintiffs' construction, for example, in the case of levomilnacipran hydrochloride, which is the active ingredient of Fetzima®, maintaining 120 mg/day of the active moiety would result in administering to a patient 137.8 mg of levomilnacipran hydrochloride per day. (*Id.* at 12).

Defendants, on the other hand, argue that "'about 120 mg/day' modifies the amount of 'levomilnacipran' and the amount of a 'pharmaceutically acceptable salt thereof' in the same way," because, *inter alia*, "the specification treats 'levomilnacipran' and 'pharmaceutically acceptable salts thereof' as interchangeable." (Def. Open. Br. at 11–12). Under Defendants' construction, the claims encompass administering the same weight of levomilnacipran free base and levomilnacipran salts, resulting in varying amounts of active moiety admitted. For example, Defendants' proposed claim construction would result in administering 120 mg of levomilnacipran hydrochloride per day, where the active moiety admitted would be 102.2 mg. (*See* Def. Open. Br. at 13–15, *see also* Pl. Open. Br. at 16).

The Court agrees with Plaintiffs and construes the disputed term in the '598 patent to mean: "about 120 mg/day of levomilnacipran or a molecular weight equivalent amount of a pharmaceutically acceptable salt of levomilnacipran." This construction is supported by the

6

language of the claim, the specification, the prosecution history, and the extrinsic evidence presented in the written submissions and at the *Markman* hearing.

Based on the clear language of the specification, a person of ordinary skill in the art ("POSA") would understand that the '598 Patent does not discuss dosage amounts in a vacuum— the invention encompasses "methods of treatment using these dosage forms" to achieve therapeutical effects on patients in need. The '598 Patent is titled "stable dosage forms of levomilnacipran," which "can comprise any **therapeutically effective amount** of levomilnacipran." '598 Patent at 11:38–39 (emphasis added). The patent defines the terms "effective amount" and "therapeutically effective amount" as "an amount or quantity of levomilnacipran which is sufficient to elicit an appreciable biological response when administered to a patient." *Id.* at 6:9–13. More specifically, the term "'effective amount' and 'therapeutically effective amount' refer to an amount of levomilnacipran that . . . is sufficient to effect such treatment of one or more symptoms of the disease, disorder or condition, or an amount . . . that is sufficient for inhibition of NE and 5-HT reuptake in a patient." *Id.* at 6:13–24. The patent further states that "the precise therapeutic dose will depend on the age, condition, weight, etc. of the patient and the nature of the condition being treated and will ultimately be at the discretion of the attending physician." *Id.* at 6:25–28. In addition, throughout the specification, the '598 Patent discusses the invention in terms of "active ingredient." *See, e.g., id.* 1:61–2:2; 2:32–53; 4:61–5:3; 6:29–47; 7:2–13 & 14:19–45.

To this end, a POSA reading the patent would understand, as Plaintiffs' expert Pierre Blier, M.D., Ph.D., opines, that the understanding in the pharmaceutical industry, including among healthcare providers and pharmaceutical manufactures, is that "the strength of a drug is generally expressed in terms of the active moiety rather than its salt form." (D.E. No. 102-1 ("Blier Decl."))

7

¶¶ 33 & 38–41). This is because modification of an active moiety to its salt form "does not usually alter the **therapeutical effectiveness** of the active moiety." (*Id.* ¶ 35 (emphasis added)). Relatedly, it is also industrial practice to refer to "drug products and compounded preparations formulated with a salt of an acid or base [by] the name of the active moiety." (*Id.* ¶ 39 (quoting Pl. Open. Br. Ex. 7, United States Pharmacopeia National Formulary, vol. 1 (2008) ("USP NF1") at AGNPF01331609)). This practice, not only is customary, but indeed is required by the FDA. In its Guidance for Industry on Naming of Drug Products Containing Salt Drug Substances, the FDA states that it applies the United States Pharmacopeia ("USP") salt policy, which provides that "[w]hen an active ingredient in a drug product is a salt, the drug product monograph title will contain the name of the active moiety (or neutral form), and not the name of the salt (e.g., 'newdrug tablets' instead of 'newdrug hydrochloride tablets')." (D.E. No. 103-1, Pl. Open. Br. Ex. 6 at AGNPF01331563; *see* USP NF1 at AGNPF01331608–09).

Defendants do not dispute that it is common industry practice to name and describe the dosage of a drug salt by its active moiety. While Defendants argue that the FDA Guidance Dr. Blier relied on was published in 2015, after the '598 Patent was issued on July 9, 2013 (D.E. No. 116 ("Def. Resp. Br.") at 5), they do not dispute that the USP policy was in place before the issuance of the '598 Patent, nor do they dispute that industry practice remained the same before and after the '598 Patent was issued. (*See id.*, *see also* Markman Hr'g Tr. at 92:12–25). More importantly, Defendants do not provide any evidence to show that a POSA reading the patent as a whole would understand the dosage descriptions differently from the industry practice. Instead, Defendants essentially argue that "a natural reading," or "a plain and simple reading," of the claims support their construction. (Def. Open. Br. at 10 & 12). But an "ordinary meaning" of a claim term is merely "short-hand for the appropriate connotation under the law: the meaning to a person

of ordinary skill in the art." *See Combined Sys., Inc. v. Defense Tech. Corp. of Am.*, 350 F.3d 1207, 1216 n.6 (Fed. Cir. 2003) (citing *Teleflex, Inc. v. Ficosa N. Am. Corp.,* 299 F.3d 1313, 1325 (Fed. Cir 2002)). Absent certain established exceptions, "a natural reading" of the claim terms cannot deviate from the "objective baseline from which to begin claim interpretation"; that is, "how a person of ordinary skill in the art understands a claim term." *See Phillips*, 415 F.3d at 1313. Fundamentally, "the descriptions in patents are not addressed to the public generally, to lawyers or to judges," but "to those skilled in the art to which the invention pertains or with which it is most nearly connected." *Id.* (quoting *In re Nelson*, 280 F.2d 172, 181 (1960)). Because Defendants fail to rebut Plaintiffs' construction based on the understanding of a POSA, the Court agrees with Plaintiffs that it would be nonsensical to a POSA to understand the patent to require admitting varying dosages or strength of levomilnacipran salt forms just to maintain the 120 mg/day overall weight of the drug compounds. Rather, a POSA reading the patent as a whole would understand that the patent is directed at administering levomilnacipran salt at the same dosage or strength as its free base form to achieve the same therapeutical effectiveness in patients.

Defendants' reliance on the prosecution history of the '598 Patent is also misplaced. Defendants contend that, to overcome an Office Action rejecting the claims for obviousness over several prior art references, the patentee filed an Amendment and Response and an expert declaration (the "Gommoll Declaration") on January 10, 2013. (Def. Open. Br. at 14–16 (citing Def. Open. Br. Ex. 7)). Defendants argue that, "[i]n his [d]eclaration, Dr. Gommoll states that '120 mg/day' of 'levomilnacipran hydrochloride" achieved better efficacy than other amounts without increasing side effects." (*Id.* at 15). Defendants further argue that, because the patentee relied on the unexpected results from "120 mg/day of levomilnacipran hydrochloride," the patent must be construed to be commensurate in scope with these results. (*Id.* at 16). That, however, is

9

not an accurate representation of the Gommoll's statement filed with the January 10, 2013 Amendment and Response. Instead, Dr. Gommoll repeatedly stated that levomilnacipran hydrochloride was admitted **at a dosage of** 120 mg/day. For example, Dr. Gommoll stated that:

> results from a double-blind, placebo-controlled, clinical investigation demonstrate that sustained release delivery of <u>levomilnacipran hydrochloride at **a dosage of** 120 mg/day</u> achieved higher and more robust efficacy than the lower 80 mg/day dose *(see* table l), but *without* increasing (and in some instances even lowering) the incidence of 12 out of the 18 measured adverse safety events, including the serious, potentially even fatal, adverse safety events of heart palpitations and tachycardia *(see* table 2).

(D.E. No. 103-2, Pl. Open. Br. Ex. 17 ("Gommoll Decl.") ¶ 5 (underline and boldness added; italics in original)). Indeed, each time Dr. Gommoll discussed the amounts of levomilnacipran hydrocholoride admitted to the patients in the clinical trial, he referred to them as "dosages" or "doses." (*See, e.g.*, *id.* ¶¶ 4–6; 8–9 & 11–14). Nothing in the Gommoll Declaration suggests that Dr. Gommoll's usage of "dosage" or "dose" was inconsistent with the industry convention. Quite the opposite, based on a clinical trial conducted using "**levomilnacipran hydrochloride at a dosage of 120 mg/day**," Dr. Gommoll stated that "[t]he patent application relates to methods for treating major depressive disorder in patients by administering **levomilnacipran** in sustained release form **at a dosage of about 120 mg/day**." (*Id.* ¶ 4 (emphasis added)). The Gommoll Declaration, which was accepted by the Patent Examiner, thus proves that it is a widely accepted industry practice to name and describe the dosage of a drug salt by its active moiety, which is how the '598 Patent refers to the dosage amounts. *See, e.g.*, '598 Patent at 3:11–13, 3:17–19, 3:35–38 & 6:29–47.

For the forgoing reasons, the Court adopts Plaintiffs' proposed construction and finds that the dosage limitation, 120 mg/day, refers to the active moiety of the levomilnacipran salt, rather than the overall drug compound.

### B. "relative to administration of racemic milnacipran hydrochloride"

Milnacipran exists in the form of two optically active enantiomers: the dextrogyral enantiomer and the levogyral enantiomer. '879 Patent at 1:60–64. The '879 Patent claims methods of treatment comprising of administering to a patient whose condition may be treated by double inhibition of serotonin and norepinephrine with a mixture of enantiomers of milnacipran hydrochloride. A representative claim of the '879 Patent reads as follows:

> A method for treating a patient afflicted with a condition or disorder which may be treated by double inhibition of serotonin (5-HT) and norepinephrine (NE) reuptake, while limiting the risks of cardiovascular disturbances and/or the risks of organ and/or tissue toxicity, comprising the step of administering to the patient an amount of a mixture of enantiomers of milnacipran hydrochloride (Z(±)-2-(aminomethyl)-N,N-diethyl-1-phenylcyclopropanecarboxamide hydrochloride), such mixture being substantially pure in the dextrogyral enantiomer, effective for alleviation of the condition or disorder, wherein the administration of said mixture limits the risks of cardiovascular disturbances and/or the risks of organ and/or tissue toxicity, <u>relative to administration of racemic milnacipran hydrochloride</u>.

'879 Patent, Claim 1 (emphasis added). The parties dispute the meaning of the clause "relative to administration of racemic[3] milnacipran hydrochloride," which appears in Claims 1 to 9, 15 to 16, and 23 to 25 of the '879 Patent. (Joint Stmt. at 4).

Plaintiffs' proposed construction is: "relative to the risks of cardiovascular disturbances and/or the risks of organ and/or tissue toxicity associated with administration of racemic milnacipran hydrochloride." (*Id*.). Plaintiffs argue the disputed term is included as "a comparator with respect to the then-known risks associated with racemic milnacipran," and that the claims do not actually require administering racemic milnacipran hydrochloride to the same patient who is administered levomilnacipran hydrochloride. (Pl. Resp. Br. at 23).

---

[3] "Racemic mixture" is a 50:50 mixture by weight of the dextrogyral enantiomer and the levogyral enantiomer. *See* '879 Patent at 4:25–28.

11

Defendants, on the other hand, proposed the following construction for the disputed term: "dependent on administering racemic milnacipran hydrochloride to the same patient." (Joint Stmt. at 4). Defendants also propose to combine the parties' proposed constructions and construct the disputed term to mean: "relative to the risks of cardiovascular disturbances and/or the risks of organ and/or tissue toxicity associated with administering racemic milnacipran hydrochloride to the same patient." (Def. Open. Br. at 24). Defendants argue that the claims require that both levomilnacipran hydrochloride and racemic milnacipran hydrochloride be administered to the same patient, so as to assess and compare the risks associated with the two drugs. (*See id.* at 20).

The Court again agrees with Plaintiffs that the disputed term does not require administering racemic milnacipran hydrochloride to the same patient who is administered levomilnacipran hydrochloride. This construction is compelled by the claims and specification of the '879 Patent. To begin, the plain language of the claim reads as a single-step method: "[a] method for treating a patient . . . comprising the step of administering" levomilnacipran hydrochloride. '879 Patent, Claim 1. The word "step" in the claim is singular, not plural. Thus, contrary to Defendants' argument, the claims cannot be read as requiring an additional step of administering milnacipran hydrochloride or an additional step of evaluating and comparing the recited risks associated with milnacipran hydrochloride and milnacipran hydrochloride incurred by the same patient. The Court also agrees that the '879 Patent's use of the definite article "the" supports Plaintiffs' construction that the disputed term does not require actual administration of racemic milnacipran hydrochloride. Specifically, the claims use "the" when referring to administration of levomilnacipran, and do not use "the" when it refers to administration of milnacipran, indicating that the latter only "serves as a historical comparator." '879 Patent Claim 1 ("wherein **the administration of** said mix limits the risk. . . relative to **administration of** racemic milnacipran hydrochloride") (emphasis added).

In addition, nowhere does the specification describe actual administration of racemic milnacipran hydrochloride to the same patient who is also administered levomilnacipran hydrochloride. Instead, the specification discloses prior art that reportedly increased incidences of cardiovascular adverse events, as well as increased organ and tissue toxicity, associated with the administration of milnacipran. '879 Patent at 3:1–17. The specification then explicitly discloses that "the inventors have now discovered that, surprisingly and unexpectedly, the dextrogyral enantiomer of milnacipran . . . induced fewer side-effects of a cardiovascular nature and less organ and/or tissue toxicity . . . than the racemic mixture." *Id.* at 3:30–39. Reasonable POSA reading the patent as a whole would understand that the disputed term of the '879 Patent merely refers to known risks associated with administration of racemic milnacipran hydrochloride.

Defendants rely on Example No. 3 in the specification and the pertinent prosecution history to argue that, because both levomilnacipran hydrochloride and racemic milnacipran hydrochloride were administered to the subject dogs in Example No. 3, and that the Patent Examiner partially relied on the Example No. 3 to allow the issuance of the '879 Patent, it follows that the claims in the '879 Patent also require administering of both drugs to the same patient. (*See* Def. Open. Br. at 20–24). Construing otherwise, according to Defendants, would render the claims invalid as indefinite and/or non-enabled. (*Id.* at 21). Defendants, again, are woefully deficient on presenting how a POSA reading the patent as a whole would understand the disputed term in the '879 Patent. As Dr. Blier explains, a POSA reviewing the specification would understand that Example No. 3 "is a comparative activity of the racemic mixture versus the active enantiomer." (D.E. No. 115-1, Pl. Resp. Br. Ex. 37 ("Blier Depo. Tr.") at 163:11–13). The result of Example No. 3 shows that the impact on the dogs' cardiovascular system "would be more limited with the levo[milnacipran hydrochloride] than with the racemic [milnacipran hydrochloride]." (*Id.* at 164:17–19). Based on

these "well-controlled experiments," Dr. Blier opines that the rather surprising conclusion that "the levo[milnacipran] that carries the activity on reuptake" causes less cardiovascular side effects can be extrapolated to humans. (*Id.* at 165:10–16). In other words, as understood by a skilled artisan, Example No. 3 supports Plaintiffs' construction because it demonstrates the relative risks associated with these two drugs and thus obviates the need to assess such risks every time a patient is treated. This, in turn, obviates the need to administer milnacipran hydrochloride to the same patient every time that patient receives levomilnacipran hydrochloride. (*See, e.g.*, Blier Decl. ¶ 57 ("clinician would not have a predetermined plan to switch a patient from one drug to another, simply to assess the safety profile of each drug. Instead, clinical judgment based on previous experience or historical data would be used to select the compound that would be most beneficial to treat that patient.")). Further, Dr. Blier credibly opines that such risk assessment is not only unnecessary every time a patient is given levomilnacipran, it is also highly unethical. (*Id.* ¶ 56 ("especially for a patient with depression, discontinuing an effective medication can have detrimental consequences. If a medication is working and the side-effects are tolerable, a clinician would not stop treatment with that medication for the sole purpose of assessing the side[-]effect profile of another drug in that same patient.")). As such, a POSA reviewing the '879 Patent would understand that the disputed term regarding milnacipran hydrochloride is included only as a comparator to the side effects associated with levomilnacipran hydrochloride and not an actual step required by the patented methods of treatment.

For the foregoing reasons, the Court adopts Plaintiffs' proposed construction.

## IV. Conclusion

The Court will construe the disputed terms as explained above. An appropriate Order accompanies this Opinion.

Date: June 8, 2021

*s/Esther Salas*
**Esther Salas, U.S.D.J.**